# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3594 | **DATE** | 9/3/2004 |
| **CASE TITLE** | Mara Silverman vs. Joseph Johnson, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. Defendants Northlake Fire Protection District and Joseph Johnson's motions for summary judgment [20-1] [22-1] are granted in part and denied in part. Defendant District is entitled to summary judgment on Counts I and V. Defendant Johnson is entitled to summary judgment on Count V. Plaintiff is entitled to pursue her federal claims on all other counts.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | 3 number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | SEP 0 7 2004 date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | 48 |
| | Copy to judge/magistrate judge. | | |
| | | 9/3/2004 date mailed notice | |
| IS | courtroom deputy's initials | IS mailing deputy initials | |
| | 2004 SEP -3 PM 1:11 U.S. DISTRICT COURT | Date/time received in central Clerk's Office | |

Document Number

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARA SILVERMAN,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 01 C 3594 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **JOSEPH JOHNSON**, individually and in | ) | |
| his official capacity as Lieutenant of the | ) | |
| Northlake Fire Protection District, the | ) | |
| **NORTHLAKE FIRE PROTECTION** | ) | |
| **DISTRICT**, and the **CITY OF** | ) | |
| **NORTHLAKE**, a Body Politic, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mara Silverman filed a complaint against Defendants Northlake Fire Protection District (the "District") and Lieutenant Joseph Johnson alleging denial of equal protection and intentional infliction of emotional distress, and alleging violations of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) (Title VII) against the District. The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a). Presently before the Court are Defendants' Motions for Summary Judgment. For the following reasons, the motions are granted in part and denied in part.

DOCKETED

SEP 0 7 2004

48

# I.  Statement of Facts

Mara Silverman was employed by Metro Paramedic Services, Inc. ("Metro") and worked as a paramedic for the District on a part time basis from July, 1998 until May 1, 1999, and then on a full time basis from May 1, 1999 until she left the District in October, 2000. While employed full time at the District, Plaintiff alleges that she was subjected to individual acts of sexual harassment as well as to a generally hostile work environment. Plaintiff filed a complaint with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") on May 27, 2000. Plaintiff named Metro Paramedic Service and Lieutenant Joseph Johnson, one of her shift supervisors, in the complaint. Plaintiff signed the EEOC charge of discrimination on June 5, 2000. On July 26, 2000, Plaintiff amended her charge to include the District. Plaintiff added a further amendment on November 13, 2000, to clarify that the alleged harassment continued until September 17, 2000. The current litigation stems from these charges. Metro Paramedic Service has not been named as a defendant. Before this Court are Motions for Summary Judgment from the District and Lt. Johnson.

## A.  Nature of Plaintiff's Employment

Metro supplies the District with certified paramedics. Under the terms of the contract, Metro guarantees that the paramedics it supplies meet certain eligibility requirements (e.g., certifications and qualifications), but each assigned paramedic is subject to prior approval by the District. The Chief of the District is responsible for interviewing all the qualified applicants and then placing those acceptable applicants on an "eligibility list." The paramedics assigned to the District are drawn from that list. Once assigned, paramedics are "responsible to the Chief of the

- 2 -

District and his officers, and subject to their supervision in administrative and logistical matters."
(Def.'s Ex. CC.) The District has the authority to refuse services from a paramedic for just cause.
The contract clarifies that though paramedics are under the supervision of the District "they are
the employees of Metro and Metro shall be responsible for their compensation and benefits."
(Id. at 4.)

Under the terms of the agreement, Plaintiff was assigned to the District as a paramedic
and was under the supervisory control of Chief Hjelmgren and his officers. During the period of
Plaintiff's full time assignment, the District organized its work schedule into three twenty-four
hour shifts, designated red, black and gold. Plaintiff worked primarily the red shift, and
occasionally the black shift. The officer in charge of the red shift was Lt. Jimmy Nolan, and the
officer in charge of the black shift was Defendant Johnson. Shift supervisors monitor the
performance of paramedics and submit any problems with a paramedic's performance to the
Chief. (Pl.'s Dep. at 295-96.)


### B.    District's Sexual Harassment Policy

The District has an official Sexual Harassment Policy which was in effect during the
relevant period. (Def.'s Ex. G.) The policy adopts the definition of sexual harassment provided
in the Illinois Human Rights Act[1] and provides numerous examples of discriminatory behavior.

---

[1] "Any unwelcome sexual advances or requests for sexual favors or any conduct of a
sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term
or condition of an individual's employment, (2) submission to or rejection of such conduct by an
individual is used as the basis for employment decisions affecting such individual, or (3) such
conduct has the purpose or effect of substantially interfering with an individual's work
performance or creating an intimidating, hostile or offensive work environment." 775 ILCS
5/2-101(e)

The examples include: sexual propositions, overt display of pornographic photographs or literature, and purposefully brushing against another person's body. The policy also provides for both an internal and external complaint procedure.

The internal complaint procedure provides that an individual victim of harassment should "directly and clearly and immediately" object to the behavior and request that it stop. (Id. at 2.) The individual should also immediately inform the "Shift Officer or the Captain," but if the individual's supervisor is the offending party, then the objection should be expressed to the next level of supervision or the Chief. The policy mandates that each instance of harassment should be documented with a written record of date, time, place, what occurred, and who did it. Once a complaint is filed, the Chief or his designee will investigate, and if the investigation indicates that the individual was harassed then "the District will neutralize the workplace from the offensive conduct and any subsequent retaliation . . . ." (Id.) The remedies available to the District run from reprimand to discharge.

The policy describes the requirements of an external complaint to the IDHR or the EEOC. The District would prefer to resolve such matters internally. (Id.) The policy spells out the temporal limitations on charges filed with the IDHR and EEOC – 180 and 300 days respectively. The policy also lists some of the broad investigative and subpoena powers of the IDHR and EEOC. The policy also provides all the contact information of the IDHR and EEOC.

Plaintiff affirmed that she had read and understood the District's Sexual Harassment Policy on July 20, 1999. (Def.'s Ex. H.) Chief Hjelmgren also signed the confirmation. In addition, Plaintiff received training on the policy and was asked afterwards if she had any questions or harbored any confusion about any aspect of the policy. (Pl.'s Dep. at 207-08.)

- 4 -

Plaintiff once again affirmed that she understood the policy. In October, 1998, all three shifts of the District received two hours of sexual harassment training. (Def.'s Ex. I.) Johnson attended the training with the rest of Black Shift on October 14, 1998.

### C.    Period of Alleged Harassment

The relevant incidents of alleged harassment began in May or June, 1999, when Johnson called Plaintiff a "slut" and repeatedly used the term "cunt" while in the presence of other firefighters. (Pl.'s Dep. at 97-99.) According to Plaintiff's testimony, this type of behavior continued through the summer of 1999. In June or July, Johnson and other firefighters debated whether Plaintiff or a certain male firefighter had a nicer butt. (Id. at 166-67, 170.) Johnson also told Plaintiff directly, "I want to do you." (Id. at 223-24.)

Johnson, Lt. Nolan, Zimich and Frick openly expressed their belief that Plaintiff had engaged in sexual activity with firefighters throughout the District. (Id. at 225.) Johnson and other firefighters would often allow Plaintiff to pass ahead of them on the stairs and then comment on the shape of her butt. Between July and November 1999, Johnson and others made comments as Plaintiff entered the shower room such as, "Want me to wash your back?" or "Leave the shower room door unlocked." (Pl.'s Ex. A at 5, 9.) During this period, Plaintiff also alleges that pornographic materials were openly displayed in the firehouse. However, Plaintiff herself contributed several *Playboy* magazines to the fire station. (Pl.'s Dep. at 164-65.) Plaintiff also discovered a large stash of pornographic material hidden in the ceiling over a bathroom stall. When she showed the materials to the Chief, he responded that "men will be men." (Pl.'s Dep. at 99-100.)

In November, 1999, Plaintiff began dating District Firefighter Bob Bailey. This relationship became a topic of conversation within the firehouse. Johnson asked Bailey if the relationship was sexual. (Pl.'s Ex. A at 5.) On one occasion Johnson commented to Plaintiff, "Bailey is spending all this money on you [going] to dinner . . . and you didn't even give him a blow job." (Bailey Dep. at 78.) According to Johnson, Bailey himself offered salacious information to his coworkers regarding his private relationship with Plaintiff. (Johnson Dep. at 187.) Bailey also used one of the *Playboy* magazines from the firehouse's library to demonstrate "how Mara looks naked." (Id. at 273-74.) In December, 1999, Plaintiff sat down to dinner in a t-shirt wet from a just completed work-out. Bailey subsequently informed her that after she left the table the other firefighters had discussed her nipples. (Pl.'s Dep. at 220-22.) After this incident, some firefighters informed Johnson that such comments were getting back to Plaintiff. (Johnson Dep. at 287-88.)

In January, 2000, Plaintiff terminated her relationship with Bailey. The break-up engendered animosity towards Plaintiff amongst the other firefighters. Johnson criticized Plaintiff for the break-up, calling her a "bitch," "no good," and "sick in the head." (Pl.'s Ex. A at 5.) At this point, Johnson also expressed that he wanted Plaintiff "out of the firehouse." (Id.) Johnson had often expressed his opinion previously that women did not belong in the firehouse as they were "nothing but trouble," (id. at 6, 11), but after the Bailey incident this opinion was directed specifically at Plaintiff. (Id. at 5.) There is no indication that he wanted Bailey, a male firefighter "out of the firehouse."

After the break-up with Bailey tensions in the firehouse increased. Bailey was very upset and often expressed this at the firehouse. Plaintiff began dating another gentleman and his visits

to the firehouse exacerbated Bailey's frustration. The break-up also had an adverse effect on other firefighters. Plaintiff specifically confronted Johnson around February 3, 2000, and asked him to stop talking about her. (Id. at 6.) The following day Johnson told Bailey, "I want Mara out of here." (Id.) Also in February, someone drew a slash through the female character on the unisex bathroom door and scrawled "Fuck Women" beneath it. In March, Johnson added to the scheduling calendar, under Plaintiff's name, "No Help Us" and "God Help Us." (Johnson Dep. at 173; Pl.'s Ex. A at 8.) In May, someone added the words "slut," "sucks," and "sucks Bailey" after Plaintiff's name. (Pl.'s Ex. A at 8.) On May 11, 2000, Johnson told Plaintiff's Metro supervisor "not to hire any more broads." (Id. at 6.) During this period of heightened animosity Plaintiff began to keep a diary of these events, (Pl.'s Ex. H), and eventually pursued a remedy through official channels.

### D.  Plaintiff's Official Complaints and the District's Response

Plaintiff's first complained to Chief Hjelmgren on March 6, 2000. On that occasion Plaintiff was accompanied by Metro Supervisor Ken McGarry. At this initial meeting, Plaintiff informed the Chief that she was "having some problems upstairs." (Hjelmgren Dep. at 44.) The Chief responded that if it involved other people he needed names. According to the Chief, Plaintiff responded that she would deal with it herself and then left. (Id. at 45.) There is contrary evidence, however, that indicates that Plaintiff provided him with the names of Lieutenant Johnson, and Firefighters Jeffrey Frick and Kevin Kalbach. (Norman Dep. at 35.) Plaintiff told him that she was being called names and that doors had been defaced in a way that seemed directed at her. (Id.) Plaintiff indicated that she did not want to lodge a formal complaint of

- 7 -

sexual harassment but she hoped the Chief and her Metro supervisor would be able to take care of it. (Id. at 35-36.)

Plaintiff next complained to the Chief on May 16, 2000, when she entered a formal complaint of sexual harassment against Johnson. Chief Hjelmgren began an investigation and arranged for Plaintiff to speak with the fire department's attorneys. Plaintiff met with Joan Cherry, attorney for the fire department, on May 27, 2000. On that same day, Plaintiff filed her complaint with the IDHR and the EEOC.

Cherry investigated the allegations and as a result of the investigation Johnson was suspended for five days for violating his duties as a supervisory employee, the standards of professional conduct, and the District's Sexual Harassment Policy. (Pl.'s Ex. A.) Three of the days of his suspension fell on days on which he was not scheduled to work. Chief Hjelmgren offered Plaintiff a shift change, or a transfer to another facility with more pay, both of which Plaintiff declined.

On June 27, 2000, Plaintiff approached Bobbie Bowen, a fellow female employee, to inquire if she would be willing to testify. Bowen was unreceptive to the idea and allegedly threatened Plaintiff's life when pressed on the issue. Plaintiff complained to Chief Hjelmgren and Metro subsequently transferred Bowen to another facility.

In September, 2000, Plaintiff complained to the Chief that Johnson had intentionally pressed up against her in the fax room of the firehouse. Chief Hjelmgren was unable to determine whether Johnson had committed an offense, but he did warn Johnson not to have physical contact with Plaintiff "for any reason, at any time." (Def.'s Ex. AA.)

- 8 -

After filing the official complaint, Plaintiff felt that conditions in the firehouse worsened, as the firefighters rallied around Johnson, the president of their union, and gave her the cold shoulder. (Pl.'s Dep. at 287-88.) A suspension party was held for Johnson at an outside location. (Bailey Dep. at 123-26.) The invitation indicated that Johnson was the "victim." (Pl.'s Ex. J.) As a result of the perceived hostility, Plaintiff resigned her position in October, 2000. (Pl.'s Dep. at 288.)

## II. **Discussion**

Summary judgment is appropriate under Rule 56 when there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "An issue of fact is genuine only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997) (quoting *Newell v. Westinghouse Elec. Corp.*, 36 F.3d 576, 578 (7th Cir. 1994) (citation omitted)). The court will view the record and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. The presence of a "scintilla" of evidence in favor of the plaintiff's position is insufficient; there must be sufficient evidence such that the trier of fact could reasonably find for the plaintiff. *Id.* at 252.

## A. Plaintiff's Failure to Raise Counts I and IV in the Original or Amended Charge

Before addressing each claim on the merits, we must first address whether the retaliation and constructive discharge claims are barred due to Plaintiff's failure to raise these specific allegations in the original EEOC charge. As a general matter, a plaintiff must include allegations that form the basis of a suit in the EEOC charge. *McKenzie v. Ill. Dept. of Trans.*, 92 F.3d 473, 481 (7th Cir. 1996). This rule affords both the EEOC and the employer the opportunity to address the specific grievances. *Id.* at 482. An exception exists due to the fact that EEOC charges are completed by laypersons, and therefore, a plaintiff "need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). This concern has produced the exception that a plaintiff may bring claims that are "like or reasonably related to the allegations of the charge growing out of such allegations." *Jenkins v. Blue Cross Mut. Hosp. Ins.*, 538 F.2d 164, 167 (7th Cir. 1976). In this case, Defendant alleges that this exception should apply neither to Plaintiff's retaliation nor her constructive discharge claim, because Plaintiff amended her complaint in November, 2000, after her resignation, and failed to include either charge in the amended complaint. *See McKenzie*, 92 F.3d at 483 (refusing to extend exception to acts that occurred prior to the amended charge); *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 545, n.2 (7th Cir. 1988) (distinguishing cases to which the exception should apply on the basis of when the retaliation occurred relative to the filing of the charge).

In *McKenzie*, the plaintiff had filed an original complaint against her employer that alleged sexual harassment, but not retaliation. *McKenzie*, 92 F.3d at 481. The plaintiff

subsequently filed an amended complaint alleging further discriminatory acts by her employer, but no retaliation, and also added a new charge of sexual harassment and retaliation against an individual. *Id.* The court determined that the plaintiff could not rely upon acts that occurred prior to the amended charge in her retaliation charge against her employer, because she failed to raise retaliation in either the original or the amended complaint. *Id.* at 483. We feel it is important to note that despite the court's holding, the plaintiff was left with several years worth of activity to form the basis of the retaliation charge. That is, the court only disallowed those events that occurred before the retaliation charge was made, which left events spread out over the next three years that the plaintiff alleged were retaliatory. Also, the plaintiff in *McKenzie* had filed a retaliation claim against an individual, so she was clearly aware of the option and what acts might trigger it. Thus, we feel that *McKenzie* simply establishes that the general exception outlined in *Jenkins* still holds, except where circumstances indicate that such an extension is unjustified.

In Plaintiff's case, she filed an initial complaint with the EEOC against Johnson and Metro in May, 2000, around the same time she filed a formal complaint of harassment against Johnson with the District. She amended the complaint to include the District on July 26, 2000. She also filed a technical amendment on November 13, 2000, to clarify that the harassment continued until September 17, 2000. Plaintiff resigned in October, 2000. For the purposes of this analysis the only relevant filing is the amendment made in November. Plaintiff could not have alleged employer retaliation on the part of the District prior to filing a charge against them. Similarly, Plaintiff could not have alleged constructive discharge prior to actually resigning. Plaintiff's situation is distinguishable from *McKenzie* because she did not add any new charges in

the amendment; she only clarified the relevant time period. Neither had Plaintiff alleged retaliation in any other charges, as had the plaintiff in *McKenzie*. In addition, the chronology in this case is very compact. All of the charges and amendments occurred within six months, and the only amendment came three and a half months after the original charge against the District and only one month after Plaintiff's resignation. Given these facts, we feel that the appropriate consideration is whether the charges of retaliation and constructive discharge are (1) "like or reasonably related" to the allegations found in the EEOC charges and (2) could reasonably be expected to grow out of the EEOC investigation of the charges. *McKenzie*, 92 F.3d at 481.

The allegations of sexual harassment, which form the basis for all of Plaintiff's claims, describe a series of actions that occurred over a tight period of time. Plaintiff alleges retaliation and constructive discharge based upon many of the same events and similar events continued after her complaints were filed. Thus, all of Plaintiff's claims are closely related in time and circumstance. Such claims tend to reinforce one another and form a single chain of alleged violations, and therefore are sufficiently related such that one could expect them to grow out of the EEOC investigation. *See Jenkins*, 538 F.2d at 167. Plaintiff does not seek to add any federal claims that are distinct in any meaningful way from the original allegations, that is, none of the claims are based upon a completely distinct set of allegations. Given such a close connection among the underlying allegations and the resulting claims, as well as the general policy of construing Title VII liberally in order to protect the layperson who filed the charge, we find that the claims of retaliation and constructive discharge are sufficiently related to the original charge to allow Plaintiff to maintain those federal claims against the District.

## B.    Count I:  Retaliation

Under Title VII, retaliation occurs when an employer subjects an employee to an adverse

employment action because that employee opposed impermissible discrimination.  *Fine v. Ryan*

*Int'l Airlines*, 305 F.3d 746, 751 (7th Cir. 2002) (citing 42 U.S.C. § 2000e-3).  We find that the

District is Plaintiff's "employer" for purposes of Title VII.  Of the several factors to consider to

determine whether an individual is an employee or an independent contractor is the employer's

"right to control."  *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378-79 (7th Cir.

1991.)  We agree with Plaintiff that the District exerted a great deal of control over her.  While

on the job, Plaintiff was supervised by Lt. Nolan and Johnson.  When a question about Plaintiff's

job performance was raised, the Chief participated in the investigation and retained the ability to

remove her from her duties.  The District provided training, equipment, and a uniform to

Plaintiff.  Therefore we find that she was employed by the District.

A plaintiff may prove retaliation using either the "direct method" or "indirect method."

*Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003).  Using the direct method a plaintiff

may present either direct evidence of retaliation, or circumstantial evidence.  *Id.*  Direct evidence

is evidence that, if believed by the trier of fact, would prove the fact in question "without reliance

on inference or presumption."  *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001) (quoting

*Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir. 1999)).  Circumstantial evidence is evidence

that would permit the trier of fact to infer the alleged discriminatory behavior.  *Rogers*, 320 F.3d

at 754.  Direct evidence of retaliation would require evidence that "a decisionmaker essentially

admitted that he took action against [Plaintiff] because she complained of discrimination."  *Id.*

Plaintiff offers no such direct evidence of retaliation, so Plaintiff must rely upon circumstantial evidence to defend against summary judgment under the direct method.

To succeed, Plaintiff must offer circumstantial evidence sufficient to allow a reasonable trier of fact to infer that a decisionmaker has intentionally taken an adverse employment action against Plaintiff in retaliation for Plaintiff's opposition to impermissible discrimination. *See id.*; *Fine*, 305 F.3d at 751. The first point to consider is whether Plaintiff suffered a retaliatory adverse employment action, only then will it be possible to determine whether the proper causal nexus attains between that action and a decisionmaker.

Plaintiff correctly points out that "adverse employment action" has enjoyed an expansive definition in this Circuit. *Knox v. State of Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996); *Smart v. Ball State Univ.*, 89 F.3d 437, 440-41 (7th Cir. 1996). "However, a materially adverse employment action is something 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Retaliation may take the form of an employer permitting fellow employees to punish another employee for invoking her Title VII rights, and this punishment may present a variety of forms. *Knox*, 93 F.3d at 1334. Plaintiff relies upon this theory of retaliatory harassment. Thus, Plaintiff must provide sufficient circumstantial evidence of such retaliatory harassment and a causal link to a decisionmaker in order to defeat the motion.

Plaintiff fails to offer sufficient evidence to meet the first requirement of a *prima facie* case of retaliation. There simply is not enough circumstantial evidence of retaliatory harassment subsequent to the exercise of her Title VII rights to establish an adverse employment action. Plaintiff initially complained to Chief Hjelmgren on March 6, 2000, when she informed the Chief

- 14 -

that she was "having some problems upstairs." The matter was not investigated. Plaintiff next complained to the Chief on May 16, 2000, when she entered a formal complaint of sexual harassment against Johnson. Chief Hjelmgren began an investigation and arranged for Plaintiff to speak with the fire department's attorneys. Plaintiff met with Joan Cherry, attorney for the fire department, on May 27, 2000. On that same day, Plaintiff filed her complaint with the IDHR and the EEOC. Thus, Plaintiff first officially opposed the alleged discrimination on May 16, 2000, however, even if one looks back to March 6, 2000, as putting her employer on notice that something was amiss (see discussion *infra* regarding the District's duty to investigate her claims), there is insufficient evidence of a subsequent increase or change in the harassment to support retaliation.

The following are the potentially retaliatory incidents that occurred during the relevant time period. On May 9, 2000, firefighters criticized Plaintiff's care of a patient and Lieutenant Johnson proved Chief Hjelmgren with a verbal and written account of the allegations of improper care. Chief Hjlemgren investigated the allegations and determined that no wrongdoing had occurred. (Def.'s Ex. P.) On June 27, 2000, Plaintiff asked another female employee, Bobbie Bowen, if she would serve as a witness on her behalf. Bowen resisted and after Plaintiff pressed the issue allegedly threatened Plaintiff's life. Plaintiff complained about this conversation and Bowen was transferred from Northlake. During this period, continuing until she resigned, Plaintiff states that she felt shunned and ostracized from her co-workers. (Pl.'s Dep. at 288.)

The single investigation for substandard patient care is too isolated to support a conclusion that it was maliciously false and intended as retaliatory. In addition, the timing of the report does not support retaliation. Plaintiff would not lodge her complaint with the Chief for

- 15 -

another week. Regardless, the charge was dismissed, citing an intransigent patient rather than substandard practices as the main culprit. There was nothing to indicate that the charge was fabricated or malicious. The confrontation with Bowen clearly stemmed from the fact of Plaintiff's complaint against the District, and Bowen admitted as much. (Bowen Dep. at 46-50.) However, once again nothing connects this confrontation to an overall pattern of retaliation. As to Plaintiff's sense of being ostracized it is difficult to see how this feeling should be differentiated from the isolation and animosity she experienced prior to filing the charge. Put another way, it would appear that Plaintiff's discomfort in the firehouse continued unabated after she filed the report. That very continuity defeats the possible inference of retaliation as there is no reasonable way to discern whether the same tenor of animosity was now due to the EEOC charge, rather than the pattern of harassment that already existed. Thus, the record is simply too thin to support the inference that Plaintiff suffered a retaliatory adverse employment action as a result of objecting to discriminatory behavior. More problematic, none of these events can be tied to a decisionmaker. Indeed, Chief Hjelmgren responded immediately to the two tangible claims of potential retaliation. Plaintiff cannot prove a case of retaliation via the direct method.

The indirect method requires that Plaintiff demonstrate that after filing the charge she was subject to an adverse employment action, despite performing her job in a satisfactory manner, and that no other similarly situated employee suffered similar action. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). A similarly situated employee is one who is "directly comparable to [Plaintiff] in all material respects." *See Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002). The indirect method eliminates the need for tying the alleged adverse employment action to a decisionmaker, and replaces it with a requirement that Plaintiff

- 16 -

demonstrate that after filing the complaint only she, and no other similar employee, was

subjected to that action. *See Rogers*, 320 F.3d at 754-55. This slightly lesser standard does not

aid Plaintiff, however, since she is unable to demonstrate a retaliatory adverse employment

action specific to the period following her charge. Without an adverse employment action

subsequent to opposing the harassment, there can be no retaliation charge under either the direct

or the indirect method. Thus, Plaintiff cannot establish a genuine issue of material fact on this

issue and the District is entitled to summary judgment as a matter of law.

### C.      Counts II and VI: Sexual Discrimination and Denial of Equal Protection

Title VII makes it unlawful for an employer "to fail or refuse to hire or discharge any

individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.

§ 2000e-2(a). To prevail on a disparate treatment claim, a plaintiff must prove that she is the

victim of intentional discrimination. *Oest v. Ill. Dept. of Corr.*, 240 F.3d 605, 611 (7th Cir.

2001). As with a charge of retaliation, a plaintiff may employ either the "direct" or "indirect"

method to defeat a motion for summary judgment on a disparate treatment claim. *Id.* In addition

to the sexual discrimination set forth in Count II, Plaintiff also raises an equal protection claim

against both the District and Johnson in Count VI. The analysis for such claims is largely

identical to the disparate treatment analysis. *Nanda v. Bd. of Trs. of the Univ. of Ill.*, 303 F.3d

817, 830 (7th Cir. 2002). Thus, Plaintiff may also defend this claim via either the direct or

indirect method. We will analyze Plaintiff's claims under the direct method first.

- 17 -

Under the direct method Plaintiff must provide sufficient evidence, either direct or circumstantial, such that a reasonable trier of fact could conclude that the required adverse employment action was motivated by discriminatory intent. *Oest*, 240 F.3d at 611. Thus, Plaintiff must establish a causal nexus between the discriminatory acts and the adverse employment action.

Plaintiff alleges several instances of intentional sexual discrimination that could be considered direct evidence of possible discrimination. Plaintiff heard from a third party that Lieutenant Johnson had stated that a firehouse was no place for a woman. (Pl.'s Ex. A at 5, 11.) Indeed, Johnson appeared to make statements of this type a few times after January, 2000, that is, after the breakup with Bailey. Plaintiff confronted Johnson and asked him to stop talking about her. (Id. at 6, 12.) Johnson, however, continued in his boorish behavior and stated at one point "I want Mara out of here." (Id. at 6.) Other than Johnson, Plaintiff alleges similar comments from other firefighters, and the fact that the female pictogram on the bathroom door was circled and slashed.

The statements from Johnson rely for their pertinence on the idea that Johnson was a supervisor, and therefore in a position of authority. This is required because under the direct method a causal nexus between the discriminatory acts and a decisionmaker must be present. The facts do not support such a nexus, and therefore Plaintiff cannot assert these claims under the direct method. Lieutenant Johnson did supervise Plaintiff's shifts on occasion, but he lacked the authority to fire or transfer Plaintiff. Indeed, Johnson apparently lacked any kind of tangible authority over the conditions of Plaintiff's employment. (Johnson Dep. at 43.) Also significant is the fact that Johnson never spoke those words directly to Plaintiff. (Pl.'s Dep. at 269-72.) These

- 18 -

facts tend to lessen the connection between the statements, and their obviously discriminatory content, from an adverse employment action. Johnson had no control over her employment, nor did he deliver these statements directly to Plaintiff in order to make his intent clear.

In addition to the specific actions of Lieutenant Johnson, Plaintiff points to the presence of pornography in the firehouse and Chief Hjelmgren's dismissal of that fact as "men will be men" as circumstantial proof of discrimination. Plaintiff also argues that she was forced to endure the "harassment and humiliation of inadequate disciplinary measures taken against Lt. Johnson." (Pl.'s Br. at 10-11.) Plaintiff feels the 5-day suspension given to Johnson was inadequate. Plaintiff additionally points to the suspension party some firefighters held off-premises for Johnson. Chief Hjelmgren's comment concerning the pornography, though unenlightened, is simply too thin to support liability on its own. Plaintiff had tolerated the presence of these materials for some time before complaining in August or September of 2000. In fact, Plaintiff had contributed pornography herself to the firehouse "library." In addition, the portion of the "library" that appeared to spark Plaintiff's complaint was found hidden in the ceiling, and Plaintiff had to stand up on a toilet and move the ceiling tile to discover it. The material was not an obtrusive and unavoidable part of the working environment. Indeed, Plaintiff admits that when such material appeared more openly on the day room television, the channel was changed soon after she entered the room. As to the punishment of Lieutenant Johnson, Plaintiff's claim that it was itself "harass[ing] and humiliat[ing]" is again a bit too speculative to survive the heightened requirements of the direct method. Lieutenant Johnson's suspension was for five days, which included three off-days. However, based on the shifts firefighters work, Johnson was suspended for a week. That does not appear to be a light enough

punishment to serve as an independent instance of harassment, although it may be relevant as part of a pattern. As to the suspension party, its relevance under the direct method is questionable given the fact that it occurred off premises.

Thus, Johnson lacked supervisory control and therefore does not provide the necessary nexus to a decisionmaker, and the discrete acts of Chief Hjelmgren, though perhaps inadequate given the larger context, were not in and of themselves discriminatory. In short, Plaintiff is unable to offer enough evidence, either direct or circumstantial, to defeat the motion for summary judgment under the direct method. However, ample evidence exists to support these claims under the indirect method.

As we outlined above, under the indirect method Plaintiff must establish that: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The first two elements are not at issue. As to the third, Plaintiff argues that there is a direct connection between the hostility toward females in the firehouse and the adverse employment actions she suffered. This Circuit employs an expansive understanding of "adverse employment actions." In Plaintiff's case, it is clear that her fellow employees created a discriminatory environment and subjected Plaintiff to disparate treatment due to her sex. The sum total of these discriminatory acts are sufficient to amount to an adverse employment action.

Plaintiff was subjected to constant sexual scrutiny. She was called a "slut" and a "cunt" in the presence of other employees. Firefighters commented upon her anatomy, and Johnson was

inspired at one point to inform Plaintiff of his desire "to do" her. Plaintiff was also subjected to invitations to join her in the shower. Plaintiff's relationship with Firefighter Bailey inspired a great deal of sexual comment and speculation. After the break-up, Johnson began expressing his desire that Plaintiff leave the District. During this period, Johnson also defaced Plaintiff's name on the scheduling calendar by adding "slut," "sucks," and "sucks Bailey" after her name. In addition, the unisex bathroom door was altered to eliminate the female pictogram. The actions and events listed above indicate sufficient evidence such that a jury could reasonably conclude that Plaintiff suffered an adverse employment action. We also feel compelled to point out that these facts gain greater weight from the fact that Plaintiff had to sleep, shower, and eat at the firehouse. That is, it was not just a place of employment, it was also a part-time home.

The facts also indicate that other similarly situated employees were treated more favorably by her employer. Male employees of the District were not subjected to such scrutiny and abuse. The insults, come-ons, and oft-expressed desire to rid the firehouse of a female presence were directed at Plaintiff precisely because she was a woman. Nothing in the record indicates that other employees were subjected to this type of behavior. Defendant attempts to argue that Bailey was subjected to similar abuse due to his relationship with Plaintiff, and therefore Plaintiff fails on the fourth element of the indirect method. This argument has no merit. As was pointed out above, Bailey freely participated in and fueled some of the sexual scrutiny of Plaintiff. Additionally, no one expressed an opinion that Bailey, a male, should be forced to leave the fire station, or that males should not be hired because they were nothing but trouble.

Plaintiff meets the four elements of the *McDonnell Douglas* indirect method of proof. Under the burden shifting regime that method establishes, summary judgment will be deemed

inappropriate unless the employer can offer a legitimate, nondiscriminatory reason for the behavior underlying the claim. *McDonnell Douglas Corp.*, 411 U.S. at 802. Defendant offers no such reason, and indeed, it is impossible to imagine what one could offer as a legitimate reason for allowing such behavior to occur at the District. Therefore, Plaintiff must be allowed to proceed with her disparate treatment and equal protection claims against the District. In addition, because most of the events that form the basis of these claims directly involve Lieutenant Johnson, Plaintiff must be allowed to proceed with her equal protection claim against Lieutenant Johnson.

### D.    Count III:  Hostile Environment

Title VII protects individuals from work environments that are discriminatorily hostile or abusive towards individuals on the basis of sex. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986). A *prima facie* showing of a hostile environment requires that a plaintiff demonstrate that: (1) she was subjected to unwelcome harassment; (2) the harassment was based on sex; (3) the harassment interfered with the plaintiff's work performance because it created an intimidating, hostile, or offensive work environment; (4) there is a basis for employer liability. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002). To be actionable, however, the work environment must be hostile and not merely unpleasant. "The occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers would be neither pervasive nor offensive enough to be actionable. The workplace that is actionable is hellish." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428 (7th Cir. 1995)). To prove a hostile environment, a plaintiff must establish that the workplace

conditions were objectively offensive, that is, a reasonable person would have found them equally objectionable. *Rogers*, 32 F.3d at 752.

Plaintiff's hostile environment claim rests upon certain sexual statements, the fact that pornography was present in the firehouse, the fax room incident, the alleged false accusation against her, the defaced bathroom door, and the District's response to her complaints. In her brief, Plaintiff alleges a "daily" barrage of harassment such that she "could no longer perform ordinary tasks within her employment without sexual comment or conversation . . . ." (Pl.'s Br. at 18.) This assertion is based upon the discrete acts that form the basis of each of Plaintiff's claims. While the analysis of the merits of Plaintiff's hostile environment claim will be limited to the discrete events mentioned above that are supported in the record, the individual events in a hostile environment claim are not carved up to see if each incident rises to the level of being severe or pervasive.[2] *See Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1044-45 (7th Cir. 2000). The issue is whether those events, when taken together, are sufficient to establish an objectively hostile environment. To make this determination we will look to the totality of the alleged circumstances, including "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or an offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Worth v. Tyer*, 276 F.3d 249, 267 (7th Cir. 2001) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

---

[2] Defendant argues that many of the actions Plaintiff relies upon are time-barred. However, since this is a hostile environment claim even those events that occurred prior to the 300 day window, in this case falling on August 9, 1999, can be considered as evidence of a hostile environment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

Johnson made several comments to Plaintiff of a sexual nature. He called her a slut in May or June 1999. In July, he said that he wanted to "do her." In December, 1999, Johnson also commented on Plaintiff's nipples and butt with other firefighters, though not when Plaintiff was present. According to Plaintiff's journal entry dated March 2, 2000, Johnson and another firefighter also asked Plaintiff to leave the door open while she showered, and then offered to wash her back. In addition to these statements and the general sexual banter in the firehouse, Plaintiff alleges that the slashed out female symbol on the shower door, the defaced work schedule, and the presence of pornography in the firehouse, indicate an objectively hostile environment. We will address each of the required elements separately.

First, the litany of abusive behavior which Plaintiff endured indicates that she was subjected to unwanted harassment. Plaintiff did not invite this behavior, and indeed she complained about it to both Johnson directly, as well as to the Chief. Second, the behavior in question was also clearly based upon her sex. This conclusion is supported by both the content and direction of the unwelcome behavior. Third, the environment this behavior created was objectively intimidating, hostile, and offensive. Whether an environment is objectively hostile is based upon a totality of the circumstances, and totality of the circumstances is not limited to the incidents of alleged harassment, but also necessarily includes the entire surrounding context. *See Harris*, 510 U.S. at 22-24. The frequency of the discriminatory actions and statements distinguish Plaintiff's case from those cases in which a hostile environment was not found to exist due to the relative scarcity of the offending events. *Cf. Rogers v. City of Chicago*, 320 F.3d 748, 752 (7th Cir. 2003) (offensive statements spread over several months); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (offensive statements spread over seven months). Plaintiff was

- 24 -

subjected to direct and indirect comments throughout her period of employment, as well as to overt alterations of her work environment (defacing the bathroom door and work schedule). As mentioned above, the fact that Plaintiff also lived at the firehouse renders the environment created by these actions particularly egregious. Plaintiff meets the third element. As to the fourth element, Plaintiff asserts that the District is strictly liable for the harassment because some of the individual harassers were supervisors. As we discussed above, Lieutenant Johnson does not qualify as a statutory supervisor. Employer liability may also be predicated, however, on whether the employer knew or had reason to know about the disparate treatment, and failed to respond adequately. *Perry*, 126 F.3d at 1014. Thus, Plaintiff must depend largely upon the allegation that Chief Hjelmgren was aware of the circumstances and failed to respond adequately to the developing situation in order to assert employer liability.

Taken in the light most favorable to Plaintiff, the record provides enough support for this allegation against the Chief to support employer liability. The record indicates an ongoing program of harassment, which manifested itself not only through discrete comments in private conversations but also through the defacement of the firehouse. Chief Hjelmgren's office was in the firehouse and he had to walk through the firehouse everyday. It is difficult to believe that he was wholly unaware of the situation. Though the Chief may not have known the particulars, it is reasonable to believe that he may have known enough to warrant a closer look. And it would not have taken a very close look to determine that Plaintiff was being subjected to unwanted harassment. There is also troubling testimony in the deposition of the Chief's administrative assistant that indicates that he had reason to know what was going on, and may have even requested that she testify that he had done everything right, a request she hotly refused. (Norman

Dep. at 121-24.) Thus, Plaintiff has presented enough to meet the fourth element. Plaintiff has established a *prima facie* case for her hostile environment claim.

Defendant District asserts that it is entitled to the *Ellerth/Faragher* affirmative defense. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). This defense, however, is predicated on the assumption that the harasser is a supervisor. In cases such as this, where the alleged harassment was not performed by a supervisor, a different standard applies.

"An employer may be found liable for a hostile work environment created by an employee who was not the plaintiff's supervisor only where the plaintiff proves that the employer has 'been negligent either in discovering or remedying the harassment.'" *Rhodes*, 359 F.3d at 506 (quoting *Parkins v. Civil Constrs. of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)). Plaintiff is entitled to reach a jury only if she can point to competent evidence that the District was negligent with respect to the harassment directed at her. The District can escape liability if it took appropriate remedial measures once apprised of the harassment. *See id.* An employer is deemed to have knowledge of the harassment if the employee makes a concerted effort to inform the employer that a problem exists or if the harassment is sufficiently obvious.

We find that Plaintiff's actions in approaching the Chief and making an informal complaint, combined with the pervasiveness of the harassment, indicate that the District knew of the harassing conduct. Taking the facts in the light most favorable to Plaintiff, we find that the marking of the calendar and the defacing of the bathroom door were not *de minimus* changes in the firehouse. It is likely that the Chief, as the head of the department, would not be totally oblivious to events that were transpiring in his station and we find that he was aware of such

- 26 -

actions even if he did not individually witness them. Additionally, Plaintiff told the Chief that she was having problems and requested his assistance. Regardless of whether she named the worst perpetrators, and evidence indicates that she did, Plaintiff provided the Chief with sufficient knowledge to begin an investigation.

An employer cannot act if it is unaware of the alleged harassment, but neither can it hide behind its formal sexual harassment policy while failing to enforce the spirit of such a policy. Although the Chief did eventually take action on Plaintiff's formal complaints, the totality of the evidence, and the indications that the Chief was aware of the harassment before May, 2000, raises the strong possibility that this was simply too little too late. Plaintiff had already endured a statutorily hostile environment for some time, an environment that the Chief had reason to know existed and therefore could have addressed. Although Plaintiff indicated to the Chief that she could deal with it herself, it was clear that she had been unable to do so in the past. Her hesitancy to file a formal complaint is understandable, especially given what she had already been through. Her fears were justified, especially considering that once she did file the complaint there is evidence that the other firefighters ostracized her, including only talking to her when a tape recorder was present. Therefore, Plaintiff's hostile environment claim will be allowed to go forward.

### E.  Count IV: Constructive Discharge

An employee is constructively discharged when she resigns due to discriminatory working conditions that a reasonable employee would have found intolerable. *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998). In Plaintiff's case we are not presented with a clear case of

"quit or be fired," nor are we presented with a clearly deteriorating situation with no sign of improvement. The facts indicate that there is no evidence of employer retaliation in response to the filing of the charge. The facts also indicate that once the formal charge was filed the District responded to that charge and began a formal investigation. In the context of that investigation and several subsequent complaints, alterations were made to the workplace, and individuals were disciplined. Thus, the issue before us boils down to whether the conditions at the time Plaintiff left the District remained objectively unbearable and held little prospect for improvement.

Plaintiff's argument on this claim centers mostly upon the degree to which the environment that produced the harassment was entrenched within the very culture of the firehouse. The record presents ample evidence of such a pervasive and entrenched culture, and we have already gone over that material multiple times. The real question, however, is what the situation looked like in the period immediately preceding Plaintiff's resignation. The relevant facts during that period include the investigation and discipline of Lieutenant Johnson, Plaintiff's complaint about pornography, the incident with Bowen, the support party for Johnson, the tape recorded conversations, and the fax room incident. Also relevant to this issue is the transfer offer the District extended to Plaintiff.

Subsequent to the District's investigation of Plaintiff's official complaint Lieutenant Johnson was suspended for five days for his actions. According to Plaintiff this was insufficient because three of those days were off days. As was pointed out at oral argument, however, a two day shift comprises an entire work week for a firefighter. Therefore, Lieutenant Johnson was suspended for an entire week's worth of pay. Johnson was also warned again by Chief Hjelmgren after the fax room incident, though the Chief determined that it was impossible to prove any

wrongdoing. With regard to the pornography, once Plaintiff complained the Chief ordered the removal of all hard core material from the firehouse. There are allegations that this order was only *pro forma* and produced little real effect. (Johnson Dep. at 195-96.) After the confrontation between Bowen and Plaintiff, Bowen was transferred out of the District. Plaintiff argues that these actions by the District were insufficient and only tended to prove that her situation would never improve. Therefore, Plaintiff argues, she had no choice but to quit. There is something to this argument. The District would argue that it took every remedial action it could, and in fact altered the workplace in an attempt to satisfy Plaintiff's concerns. However, the fact remains that the problems kept occurring. Indeed, rather than being obviously deterred in any way by the District's actions, other firefighters threw a suspension party for Lieutenant Johnson. While this was obviously not an employer sponsored event, such actions coupled with the resentment and continued hostility Plaintiff experienced indicate that the District's actions were not adequately addressing the festering climate of sexual hostility present in that firehouse. The District also points to the fact that it offered to alleviate Plaintiff's discomfort by either altering her shift or transferring her to another nearby firehouse. Plaintiff refused both of these offers, fearing that the harassment would follow her to her next position. Indeed, the offer of a transfer to another department, which would result in no material alteration of Plaintiff's employment conditions, constitutes an acceptable remedial response by an employer. *See Saxton v. AT&T*, 10 F.3d 526, 535-36 (7th Cir. 1993); *see also Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997). What we question in this case is why the solution was to transfer Plaintiff. Why was Lt. Johnson not presented with this option? *See Saxton*, 10 F.3d at 535-36 (employer responded appropriately where it transferred harassing supervisor after plaintiff declined an offer to transfer

- 29 -

her position.) The message such actions send to the other male employees is that so long as they can endure a five day suspension, they will effectively be able to drive away any female employee who refuses to put up with their antics and "just be one of the boys." That defeats the purpose of Title VII protections.

Plaintiff's constructive discharge claim comes down to whether the District's responses were sufficient to address and correct the harassment. Taken in the light most favorable to the Plaintiff, the record raises questions about whether any real prospect for improvement from the objectively unbearable conditions Plaintiff had previously endured could be expected to occur. The motion for summary judgment on this claim is denied.

### F. Count V: Intentional Infliction of Emotional Distress

Plaintiff and Defendants spend a great deal of time and effort debating whether the Illinois Human Rights Act preempts this claim. The IHRA preempts tort claims that are "inextricably linked" to allegations of sexual harassment and mandates that such claims should only be brought to the IHRC. 775 ILCS 5/2-102(D); 775 ILCS 5/8-111(C); *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 22-23 (Ill. 1997). Thus, an intentional infliction of emotional distress claim must be dismissed if it depends on factual allegations identical to those set forth in a sexual harassment claim. *Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 905 (7th Cir. 2002). Plaintiff's intentional infliction of emotional distress relies on facts identical to those supporting her Title VII sexual harassment claim. Plaintiff attempts to analogize her case to *Maksimovic*, where the Illinois Supreme Court held that a plaintiff could raise tort claims of assault, battery, and false imprisonment despite the fact that many of the same facts were used to support a sexual

harassment claim. 687 N.E.2d at 23. The *Maksimovic* court's holding establishes that independent tortious acts are not preempted when the sexual harassment claim is incidental to those tort claims. *Id.* ("The sexual harassment aspect of this case is merely incidental to what are otherwise ordinary common law tort claims."). That is not the case here. Plaintiff essentially alleges intentional infliction of emotional distress because she was sexually harassed. The claim rests on the same operative facts alleged in the sexual harassment charge. Therefore, the claim is preempted and summary judgment is appropriate for both Defendant District and Defendant Johnson.

## III. Conclusion

We find that Defendant District is entitled to summary judgment on Counts I and V. Defendant Johnson is entitled to summary judgment on Count V. Plaintiff is entitled to pursue her federal claims on all other counts.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: September 3, 2004.

Copies have been mailed to:

JOHN P. DeROSE, Esq.  
John P. DeRose & Associates  
15 Spinning Wheel Road  
Suite 328  
Hinsdale, IL 60521

MICHAEL W. CONDON, Esq.  
SARA M. CLIFFE, Esq.  
Hervas, Sotos, Condon & Bersani, P.C.  
333 Pierce Road, Suite 195  
P.O. Box 4109  
Itasca, IL 60143-4109

STEPHEN H. DINOLFO, Esq.  
Ottosen, Trevarthen, Britz, Kelly & Cooper  
300 South County Farm Road  
Third Floor  
Wheaton, IL 60187

Attorney for Plaintiff

Attorneys for Defendants